```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


Rhonda Sue Kershner,           :

       Plaintiff,              :

    v.                         :    Case No.  2:13-cv-65

                               :    JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,    Magistrate Judge Kemp

       Defendant.              :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Rhonda Sue Kershner, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on November 25, 2009, and alleged that plaintiff became disabled on June 6, 2007.

After initial administrative denials of her applications, plaintiff was given a hearing before an Administrative Law Judge on July 13, 2011.  In a decision dated September 21, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on November 26, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on April 8, 2013.  Plaintiff filed her statement of specific errors on May 13, 2013.  The Commissioner filed a response on July 17, 2013.  Plaintiff filed a reply brief on July 29, 2013, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 44 years old at the time of the administrative hearing and who has a twelfth grade education,

testified as follows.  Her testimony appears at pages 32-51 of the administrative record.

Plaintiff worked for Donato's Pizza for almost eighteen years.  She stopped working due to a car accident.  She had neither worked nor looked for work since the accident.  She was a manager at Donato's and was on her way to work when she was the victim of a chain of collisions caused by some geese being trapped on the roadway.  She was treated in the emergency room that day and later settled a claim against the driver who caused the accident.

At Donato's, plaintiff's work included being on her feet all day except for doing paperwork, and supervising about eight people.  She had responsibilities for financial operations and hiring, firing, and training employees.  She attempted to go back to work shortly after her accident but could not tolerate the level of physical activity required.  Even sitting at home to pay bills bothers her back.

Plaintiff testified to having problems with her shoulder and neck as well.  When she used a computer, if she did not periodically readjust her neck position she got migraine headaches.  Also, using a computer hurt her left shoulder.  If she used the computer for half an hour, she would have to take a 20-minute break before resuming use.  She also had pain in her left hand and arm after about fifteen minutes of typing.  Her grip in that hand was reduced as well.  Plaintiff testified that she had sleep apnea and used a CPAP machine at night.  She did not sleep well and usually napped during the day.  Finally, even with medication she developed migraine headaches several times a week which would incapacitate her for an entire day.

### III.  The Medical Records

The medical records in this case are found beginning on page 186 of the administrative record.  The Court summarizes the pertinent records as follows.

The first 388 pages of records are all treatment notes from

Physicians Plus, and are dated from 1999 through 2008.  These records are very difficult to read, especially the dates.  See Tr. 186-676.  Plaintiff makes little reference to them in her statement of errors, stating only that these records show "objective signs and symptoms, including spinal spasm, spinal edema, and restricted range of motion throughout the cervical, thoracic and lumbar regions of the spine."  Statement of Errors, Doc. 11, at 3.  Although plaintiff refers to them as a whole later in her statement of errors for the proposition that the records show objective signs of a back impairment, plaintiff cites to no specific page or pages of these records.  The Court will not attempt to summarize them further here.

     The accident which plaintiff testified about happened on June 6, 2007.  She was treated in the emergency room of Grady Memorial Hospital that day and diagnosed with cervical and back strain.  She was to be treated with analgesics and routine back and neck care.  (Tr. 723).  Further hospital notes show that she participated in physical therapy for two months and that she got no lasting relief from the treatments and that she reported no relief from chiropractic treatments either.  She was having trouble sleeping and with lifting objects weighing more than five pounds.  (Tr. 720-21).  A subsequent note from Dr. Brightman showed a diagnosis of chronic neck and back pain from the accident.  Objective tests showed only mild spondylosis of the cervical spine and mild stenosis and degenerative disc disease of the lumbar spine.  (Tr. 716-17).  A later MRI showed mild spurring in the thoracic spine and very shallow scoliotic curvatures of the cervical spine.  (Tr. 696).  Additional hospital notes show that in 2009, plaintiff underwent physical therapy for her left shoulder.  She showed some increase in range of motion at the end of the therapy but no improvement in her pain.  (Tr. 764).

Plaintiff was seeing Dr. Held when the vehicle accident happened.  Five days after, Dr. Held gave her Motrin and Vicodin for low back pain, and noted a history of degenerative disease in the spine.  A note of July 2, 2007 seems to indicate that plaintiff was back at work but was having pain in the middle and lower back regions.  It appears she stopped working three days later.  She was doing physical therapy and exercise at home.  A note from September 11, 2007, showed some neck pain and headaches.  The diagnosis at that time was whiplash and shoulder and neck spasms.  Other notes from subsequent visits throughout 2008 and 2009 show referrals to a pain specialist and neurosurgeon and some left shoulder problems which were being treated with cortisone shots.  An MRI of the neck was normal, however.  Plaintiff was also being treated by a chiropractor and with massages.  One note also makes mention of fibromyalgia. (Tr. 767-892).

Plaintiff was evaluated by Dr. Reddy for pain management on February 14, 2008.  By then, she was reporting a lengthy history of low back and left leg pain, made worse by the accident.  She also began experiencing neck pain, headaches, and left arm and shoulder pain after the accident.  Examination revealed normal posture, transfers and gait and fairly full ranges of motion in the spine and shoulder.  Strength and sensation were normal as were reflexes.  Dr. Reddy recommended injections as well as a continuation of medications.  (Tr. 845-47).  In November of that year, plaintiff felt her symptoms were "fairly well-managed at this time."  (Tr. 848).  Further notes are similar but did show little pain relief.  By January, 2010, Dr. Reddy was reporting that plaintiff continued to suffer from fibromyalgia, occipital neuritis, lumbar degenerative disc disease, and supraspinatus tendonitis "with a tinge of whiplash associated disorder."  (Tr. 898).  Plaintiff had also been started on Lyrica for pain but had

not responded to the initial dosage.

    Dr. Held completed a form on February 11, 2010 indicating that plaintiff could use her extremities for activities of daily living but could not run a sweeper.  She was stiff in her joints and could not lift more than ten pounds, with no lifting ability in the left arm.  That report did not indicate total disability. (Tr. 945).  However, in a report apparently completed in 2009, Dr. Held did state that plaintiff could stand for no more than 20-30 minutes in a work day and sit only 15-30 minutes.  (Tr. 1114-15).

    Dr. McGrail, one of the treating physicians, filled out a functional capacity report on June 14, 2010.  He did not list any diagnoses in his report, but, most significantly, limited plaintiff to a total of six hours of either standing or sitting during a work day.  He also included a number of postural and environmental restrictions.  He thought plaintiff could work only 0-3 days per week and less than four weeks per month and that these limitations had existed since the car accident.  (Tr. 980-82).  He cited as support for his evaluation the MRIs and records of his examinations.

    Plaintiff began seeing Dr. Barker for primary care some time in 2010.  In May, 2010, he noted that plaintiff had not tolerated any stabilizing medicines for fibromyalgia and that she also was showing some abnormal liver findings.  He suggested weight loss and regular exercise.  By June, 2010, she walking "a lot" but still was not sleeping well and was tired during the day.  By September, she was using a CPAP machine for sleep apnea.  Many of his subsequent notes deal with her efforts to lose weight.  By December, she was reporting a lot of fatigue and was not walking outdoors due to fear of falling.  It appears from later notes that she was doing water aerobics, and that her energy level had improved since she was started on Wellbutrin.  Dr. Barker

subsequently ordered x-rays of her cervical spine which were read as showing only some minor anterior ossific spurring at C6-7, which finding was characterized as "fairly minimal." (Tr. 1155). On May 27, 2011, Dr. Barker also filled out a physical capacity evaluation form. Like Drs. Held and McGrail, he made findings inconsistent with the ability to work on a full-time basis, such as being able to sit and stand for two hours or less in a work day and the need to lie down three or four times a day. (Tr. 1167-71). Dr. Barker appeared to attribute plaintiff's inability to work to her fibromyalgia.

In April and May of 2011, plaintiff did more physical therapy. By her discharge date, the physical therapist stated that she had a good prognosis and that she had shown improvements in range of motion and strength, although, as with her other experiences with physical therapy, she did not show any improvement in her symptoms. She was able to carry five to ten pounds, to drive independently, and to reach without difficulty, but she could not do heavy housework, forward bending, or vacuuming, sweeping or mopping. (Tr. 1223-25).

### IV.  The Medical Expert Testimony

A medical expert, Dr. Kendrick, testified at the administrative hearing. His testimony begins on page 48 of the record.

Dr. Kendrick identified plaintiff's impairments as lumbar spondylosis, rotator cuff tendinopathy of the left shoulder, carpal tunnel syndrome on the left side, fibromyalgia, diabetes mellitus, and sleep apnea. He did not believe any of these impairments satisfied any portion of the Listing of Impairments. Dr. Kendrick testified that plaintiff could do sedentary work with these restrictions: lifting ten pounds occasionally and five pounds frequently, standing or walking for up to 30 minutes at a time for up to two hours in a day; sitting for up to one hour at

a time for up to six hours in a day; and bending, stooping, kneeling and crawling occasionally. She could occasionally climb stairs but not ladders, should not work at heights or around dangerous machinery, and could use her left hand or arm for fine and gross manipulation and reaching and handling for only 50% of a work day. He further testified that his assessment took into account any pain which plaintiff suffered either in the form of headaches or in other parts of her body.

## V. The Vocational Testimony

A vocational expert, Ms. Kaufman, also testified at the administrative hearing. Her testimony begins at page 61 of the record.

Ms. Kaufman classified plaintiff's past work as a manager of a fast food restaurant as light and skilled, although plaintiff may have performed it at the heavy exertional level. There was no other past relevant work.

Ms. Kaufman was asked questions about someone who could do sedentary work activity as described by Dr. Kendrick and who, in addition, was moderately impaired in her ability to withstand the stress of everyday work. She responded that such a person could not do plaintiff's past work but could do about 800 jobs in the central Ohio area. The small number was due primarily to the restrictions placed on plaintiff's use of her left arm and hand. Jobs such as film inspector, sorter, and clerk would be included. If plaintiff were limited in the ways she testified, however, Ms. Kaufman did not think she could work.

## VI. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 10 through 19 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements of the Social Security Act through

December 31, 2012.  Next, he found that she had not engaged in substantial gainful activity after her alleged onset date of June 6, 2007.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including degenerative disease/strain of her cervical and lumbar spine and left shoulder, fibromyalgia, obesity, sleep apnea, and left carpal tunnel syndrome.  The ALJ also found that plaintiff's impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work with only those restrictions described in Dr. Kendrick's testimony (that is, lifting ten pounds occasionally and five pounds frequently, standing or walking for up to 30 minutes at a time for up to two hours in a day; sitting for up to one hour at a time for up to six hours in a day, bending, stooping, kneeling and crawling occasionally, climbing stairs occasionally but not ladders, no work at heights or around dangerous machinery, and using her left hand and arm for fine and gross manipulation and reaching and handling for only 50% of a work day).  The ALJ found that, with these restrictions, plaintiff could not perform her past relevant work, but she could do those jobs identified by Ms. Kaufman, totaling about 800 in the local economy.  The ALJ also found that such jobs exist in significant numbers because they are in several different industries, are not of an isolated nature, and exist in an area where plaintiff would not have to travel significant distances in order to work.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

### VII. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, plaintiff asserts (1)

that the ALJ did not give appropriate weight to the opinions of three treating physicians, Drs. Held, McGrail, and Barker; (2) that the ALJ did not properly assess the credibility of her testimony; and (3) that the ALJ erred when he concluded that the number of jobs identified by Ms. Kaufman were significant.  The Court reviews the ALJ's decision using this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's first assignment of error focuses on the ALJ's rejection of opinions from three treating sources - Dr. Held, Dr. McGrail, and Dr. Barker.  In order to place the issue into proper

context, it is important to set forth in detail the ALJ's explanation for the treatment of these physicians' opinions.

The ALJ explicitly adopted the residual functional capacity finding made by Dr. Kendrick, the testifying medical expert. After explaining why he chose that evaluation over the less restrictive opinions of the state agency reviewers, the ALJ turned to the treating sources.  He acknowledged that each of the three treating doctors had, at one time or another, limited plaintiff to a range of activities that would be inconsistent with employment.  (Tr. 16-17).  He noted that he gave these opinions "deference" but not controlling weight, stating that "the objective findings simply do not support an inability to sustain sedentary work with the enumerated limitations on a sustained fulltime competitive basis."  (Tr. 17).  Further, the ALJ concluded that these three doctors "appear to have relied significantly on the subjective statements of the claimant, who is not found to be entirely credible."  Id.  That conclusion was apparently based on what the ALJ viewed as, again, the lack of objective findings in the record to support plaintiff's claim of disabling symptoms, contradictory evidence in the form of Dr. Thomas' March, 2010 report about her muscle strength, and the fact that her activities of daily living, described both to Dr. Tanley and at the administrative hearing, were "not consistent with the level and persistence of symptoms that she alleges." Id.

Taking these various rationales in reverse order, the first concern the Court has with the ALJ's findings is the reasons he gave for discounting plaintiff's credibility.  Although the ALJ has substantial leeway in evaluating the credibility of the claimant, it is also true that a social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the

-10-

claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3). Further, the ALJ must provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record.  See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

    Here, the ALJ does not explain what objective findings, other than one report from Dr. Thomas, a non-examining medical consultant, are actually inconsistent with plaintiff's testimony or report of symptoms to her other physicians.  The finding to which the ALJ referred was not actually made by Dr. Thomas, who never saw plaintiff, but was part of what Dr. Thomas described as a "recent examination."  (Tr. 970).  Although it is not clear what report Dr. Thomas meant, it could well be a report from Dr. Reddy, who was treating plaintiff for pain, showing that plaintiff's strength in both her upper and lower extremities was 5/5, which is a normal finding.  (Tr. 899).  In fact, there are many other such reports in the file as well.  However, Dr. Reddy also diagnosed plaintiff with fibromyalgia, and Dr. Thomas appears to have concurred in that diagnosis and noted in her report that plaintiff showed "18/18 points positive for fibromyalgia."  (Tr. 966).

    In Rogers v. Comm'r of Social Security, 486 F.3d 234, 243 (6th Cir. 2007), the Court of Appeals noted that often "fibromyalgia patients present no objectively alarming signs." In fact, they typically "'manifest normal muscle strength ....'" Id. at 244, quoting Preston v. Sec'y of Health & Human Servs., 854 F.2d 815, 820 (6th Cir. 1988).  The Rogers court noted that when an ALJ fails to discuss the diagnostic criteria for fibromyalgia and discounts either the claimant's testimony or the

-11-

reports of treating physicians based on the absence of supporting objective evidence, the ALJ commits error. It is therefore difficult to sustain the ALJ's credibility finding on that basis.

The only other evidence the ALJ cited was the fact that plaintiff was able to drive, get her children off to school, play cards, sing, and go to bed by 10:00 at night. That represents a fairly selective view of the evidence, and also inexplicably gives full credibility to plaintiff's statements to one examiner (Dr. Tanley) while deeming her statements to other physicians, such as her treating doctors, less worthy of belief. In fact, it is not even a fair characterization of plaintiff's own testimony. At the hearing, plaintiff testified that although she got up with her children, they fixed breakfast themselves and walked to the school bus without her. She also testified, in testimony the ALJ apparently did not credit, that she took a two or three-hour nap each day due to fatigue and that although she went to bed at 10:00, she got up four or five times every night. She also described in great detail the limitations she faced on a daily basis due to pain in a report given to the Social Security Administration (Ex. 7E, Tr. 124-34), but the ALJ made no mention of that in his evaluation of her credibility. Overall, the Court finds that the ALJ's credibility determination is no more sustainable here than was the one rejected in <u>Kalmbach v. Comm'r of Social Security</u>, 409 Fed. Appx. 852, 864 (6th Cir. Jan. 7, 2011), where the ALJ in a fibromyalgia case also discounted a claimant's credibility based on the absence of objective medical evidence and "grossly mischaracterize[d] the available evidence" concerning her daily and social activities.

The Court's conclusion that the ALJ did not properly assess plaintiff's credibility substantially undermines his rationale for rejecting the opinions of her three treating physicians. The ALJ used the plaintiff's lack of credibility as a reason for finding her statements to those physicians less than believable,

and for discounting their opinions because they relied on her report of symptoms.  But in a fibromyalgia case, where all of the available objective indications supported that diagnosis, there is often little else for a treating physician to rely on, other than a longitudinal record of attempting various treatment methods to reduce the patient's pain, often without much success.  The record seems to indicate such a course of treatment here.  The only other reason provided by the ALJ for preferring Dr. Kendrick's assessment of plaintiff's limitations over that of her treating sources is, again, the absence of objective medical evidence.  Apart from the fact that the ALJ's decision on this issue is probably not sufficiently detailed in its description of the medical evidence to satisfy the articulation standard set forth in 20 C.F.R. §404.1527, as interpreted by <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004), it, too, fails to take into account the lack of correlation between objective findings and limitations due to fibromyalgia.  Given that both the rejection of the treating source opinions and the evaluation of plaintiff's credibility are not sustainable, the case must be remanded for a more thorough analysis of these issues.

    Plaintiff also raises a claim about the ALJ's conclusion that the number of jobs identified by the vocational expert is significant.  It is certainly borderline, but the ALJ did give specific reasons for finding that the small number of jobs were not isolated and existed in different industries.  On the other hand, plaintiff argues (although without identifying any support for her argument in the administrative record) that some of the jobs identified by the vocational expert may not be available to her, at least based on information from the <u>Dictionary of Occupational Titles</u>.  That is an argument that plaintiff is free to pursue on remand, where the ALJ will have the responsibility of insuring that a complete record is made on that issue.

###         VIII.    Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner of Social Security for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

###         IX.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See _Thomas v. Arn_, 474 U.S. 140 (1985); _United States v. Walters_, 638 F.2d 947 (6th Cir. 1981).


/s/ Terence P. Kemp
United States Magistrate Judge